IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 4, 2002 Session

## STATE OF TENNESSEE v. KEVIN JONES

**Appeal from the Criminal Court for Shelby County**
**No. 10911     Bernie Weinman, Judge**

---

**No. W2001-01381-CCA-R3-CD  - Filed January 2, 2003**

---

A Shelby County Criminal Court jury convicted the defendant, Kevin Jones, of aggravated child abuse, a Class A felony, and the trial court sentenced him as a Range I, violent offender to twenty years in confinement.  The defendant appeals, claiming (1) that the evidence is insufficient to support his conviction; (2) that the trial court erred by failing to grant his request for a mistrial when a police officer testified that the defendant refused to give a statement to the police; (3) that the trial court should have ordered a mistrial when the state failed to provide him with Jencks material; and (4) that his sentence is excessive.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Marty B. McAfee, Memphis, Tennessee (on appeal), and James O. Marty, Memphis, Tennessee (at trial), for the appellant, Kevin Jones.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Camille Nicole McMullen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to the victim's being burned by hot water in a bathtub.  LaSonya Ellis, the victim's mother, testified that in September 1999, she lived in an apartment with the defendant and her two sons, the victim and Kyrus, who were about two and four years old respectively at the time of trial.  She said that she and the defendant had lived together for about six months and that they were engaged.  She said that on September 1, 1999, the defendant agreed to watch her children while she was at work.  She said that she went to work at 7:00 a.m. and that the boys were fine at that time.  She said that about 2:15 p.m., the defendant telephoned her at work and told her that she needed to spank Kyrus because Kyrus had burned the sixteen-month-old victim.

Ms. Ellis testified that she went home immediately and found the victim lying face down on a pillow in the living room. She said that skin was peeling off the victim's leg and that the victim had a black eye and a busted lip. She said that Kyrus was naked and sitting on the couch and that she did not see any injuries to him. She said that the defendant told her that Kyrus had put the victim in the bathtub and that the defendant was jumping up and down, hitting himself in the head, and saying, "I'm going to jail. I'm going to jail." She said that she took both of her children to the South Methodist Hospital emergency room and that once a doctor started treating the victim's burns, the doctor realized the victim needed to be transported to LeBonheur Children's Medical Center. She said the victim was in the hospital for about a month and had three surgeries on his legs.

Ms. Ellis testified that although the victim was younger than Kyrus, the victim weighed more than his brother. She said that she had never seen Kyrus pick up the victim and that the boys were not allowed to take baths unattended. She said that the defendant had been in the boys' lives for about nine months and that she did not allow him to discipline her children. She said that the defendant often played with Kyrus but did not have much to do with the victim. She said that in the days before the victim was burned, the victim did not want the defendant to hold him and would cry if the defendant came near him.

On cross-examination, Ms. Ellis acknowledged that she had wanted to live with the defendant because he was a good man and loved her children. She said that he had a job and that they combined their incomes to pay monthly bills. She said that she and the defendant were planning to get married and that they had saved money for a honeymoon. She acknowledged that she had never seen the defendant spank or mistreat her children and that she had not been afraid to leave her boys with him.

Ms. Ellis acknowledged that the defendant told her the following: On the day the victim was burned, the defendant was going to take a bath. As he was running water into the tub, the doorbell rang, and he went to answer it. While the defendant was at the door, Kyrus and the victim went from their bedroom into the bathroom, and Kyrus put the victim into the bathtub. The defendant heard the victim crying, went into the bathroom, and saw the victim sitting in the tub. Kyrus was standing in the tub, and the victim was struggling to get out of it. According to the defendant, the victim may have gotten his black eye and busted lip from trying to get out of the tub. She testified that she did not believe the defendant's explanation for the victim's injuries.

Ms. Ellis acknowledged telling someone that when she would draw a bath for herself, Kyrus would want to get into the tub and that the victim would follow Kyrus. She also acknowledged that the commode was beside the tub and that a child could get into the bathtub by climbing onto the commode. She said that although she had never seen her boys get into the tub that way, they had climbed into the tub before. She said that the victim was right-handed and acknowledged that if he tried to get into the tub, he probably would have done so by first swinging his right leg over the side.

Delores Ellis, the victim's maternal grandmother, testified that on September 1, 1999, she was at work and received a telephone call from her daughter. She said that she went to the hospital

emergency room and saw the victim crying and lying on a stretcher. She said that she had never seen a child that badly burned and that she had to leave the room. She said that the victim's paternal grandmother and the defendant's father also were at the hospital. She said that the victim had a black eye, bruises on his chest, and had been burned from his genitals to his feet. She said that about three days before the victim was burned, she kept the victim and Kyrus and that the boys were fine. She said that she saw Kyrus at the hospital and that he did not look like he had been in hot bathwater with the victim. She said that as a result of the victim's burning, she got custody of the two boys and that her daughter moved in with her. On cross-examination, Ms. Ellis acknowledged that her daughter had never told her that the defendant mistreated the children.

Rosie Murray, the victim's paternal grandmother, testified that she went to the hospital on September 1. She said that the defendant was sitting in front of the victim and that Kyrus was sitting on the defendant's lap. She said that the victim was upset, that his buttocks were burned, and that his legs were wrapped in bandages. She said that she did not see any burns on Kyrus. She said that she had seen the victim four to five days before and that the victim did not have bruises at that time.

Stephanie Storgion, a pediatrician at LeBonheur Children's Medical Center, testified that she examined the victim on September 2, 1999, and that the victim suffered second and third degree burns. She said that when she examined the victim, she could not see his burns because they were wrapped in bandages. She said that in addition to the burns, the victim had bruises on the inside of his right eye and that his left eye and lip were bruised and swollen. She said that the victim had other bruises on his extremities and a strap-like mark on his back that was consistent with a belt. She said the fact that the victim was burned over a large area indicated that he suffered an immersion injury, as opposed to a splash injury. She said that immersion injuries result from a person being dunked into a liquid and that if the victim had suffered splash burns, he would have suffered burns to other areas of his body, including his chest, upper arm, and face. She said that if the victim had been splashed with hot water, his burns most likely would have been only first and second degree burns. She said the distribution of the victim's burns showed that he had been placed into hot water, as opposed to accidentally falling into the water or the water being poured onto him. She said the victim probably was immersed for more than a minute in water that had a temperature of at least one hundred fifty degrees. She said that based on the victim's bruises and the descriptions of his burns in his medical report, she concluded that someone intentionally injured the victim.

On cross-examination, Dr. Storgion testified that in addition to examining the victim, she talked to his mother. She said she did not talk to the defendant. She said the physician who initially evaluated the victim noted on the victim's medical report that the victim suffered an immersion injury. She said that after she read the notation, she also concluded that the victim had suffered an immersion injury. She denied concluding immediately that the victim had been abused. She said that the back of the victim's legs had been burned and that the victim suffered a severe burn to his right buttock. She said that if the victim had climbed into the bathtub and had come into contact with hot water spilling out of the faucet, then other areas of the victim's buttocks would have been burned and the victim would have suffered splash burns. She acknowledged that the victim was

hooked up to an EKG monitor in the hospital and that tape used to hold the monitor's leads onto the victim could have left marks on his body.

Jose Iglesias, a pediatric surgery fellow at LeBonheur Children's Medical Center, acknowledged that on September 1, 1999, he examined the victim and that the victim had second and third degree burns on ten percent of his body. He said that the victim mainly was burned on the back of his legs. He said that the victim also was burned on the back of his thighs and part of his buttocks and calves. He said the victim's feet were not burned. He said that the victim's burns were deep and that most were third degree burns. He said that the pattern of the victim's burns looked like the victim had been immersed in hot water. He said that after a few days, the victim's burns showed no signs of healing and that he decided the victim needed skin grafts. He said that the victim was in the hospital for about a month and that the pattern of the victim's burns indicated the victim had been forced to sit in hot water.

On cross-examination, Dr. Iglesias testified that the victim suffered deep burns to both of his legs but that the burns were worse on his right side. He acknowledged that the victim's right arm had been burned and said that the victim also had small burns on both hands. He agreed that a right-handed child would tend to climb into a bathtub by putting the right side of the body into the tub first. However, he said that if the victim had done that, the victim's right foot would have been burned. Dr. Iglesias acknowledged that if the victim had climbed into the tub and burned his right side, then the victim's left side could have been burned as the victim was trying to get away from the water. He said, though, that the victim had to have been burned from water that had collected in the bottom of the tub, not just from water that had been pouring out of the faucet. He acknowledged that the victim could have slipped and fallen into the bathtub. He said that the amount of time the victim had to spend in hot water to get these second and third degree burns depended upon the water's temperature and that if the water was hot enough, the victim's burns could have been instantaneous. He said, though, that water from a household faucet typically was not hot enough to cause instantaneous burns and that the victim had to be in the water for several seconds.

Dan Shell, a plastic and reconstructive surgeon, testified that he saw the victim on November 7, 2000. He said that on November 22, 2000, he performed surgery on the victim's right leg in order to remove tough scar tissue that had formed on the back of the victim's right knee. He said that the victim would need three more surgeries to remove additional scar tissue. He said that after the surgery, the victim was able to extend and straighten his right leg and that the victim was able to move both legs normally. He said that the victim's legs would always be scarred.

Sergeant Sharonda Hampton from the Memphis Police Department's Child Abuse Squad testified that on September 1, 1999, she went to Methodist South Hospital to investigate a child with second and third degree burns. She said that she spoke with the defendant briefly and that he was cooperative. She said that the defendant answered her questions but did not provide a statement.

The defense called Omar McKinney, who testified that he was the defendant's and Ms. Ellis's neighbor in September 1999. He said that on the morning of September 1, he helped the

defendant carry Kyrus and the victim upstairs to the defendant's apartment. He said that at 2:15 p.m., he returned to the defendant's apartment to borrow a cooking pot. He said that the defendant answered the door and was wearing a t-shirt and shorts. He said that he asked to borrow the pot and that the defendant went into the kitchen while he waited outside the door. He said the defendant returned with the pot, gave it to him, and that he and the defendant talked for a few minutes about an upcoming ballgame. He said that he heard Ms. Ellis's children yell and that the defendant ran back into the apartment. He said he had thought the children were playing and went home.

On cross-examination, Mr. McKinney testified that he had borrowed cooking pots from LaSonya Ellis and the defendant before. He said that when he went to the defendant's apartment, the defendant answered the door and said he was running water for a bath. He said he did not hear running water. He denied telling Ms. Ellis that he and the defendant were smoking marijuana and drinking alcohol in the apartment on the day the victim was burned. He said that the weekend after the victim was injured, Ms. Ellis came to his apartment and told his fiancee about what had happened to the victim. He acknowledged that he did not tell Ms. Ellis about what he had seen when he went to borrow the pot from the defendant. He said that he had not talked to the defendant about the case, and he denied telling Ms. Ellis that the defendant promised him a favor in return for his testimony.

On rebuttal, LaSonya Ellis testified that after the victim was burned, the defendant told her that Omar McKinney came to their apartment to borrow a pot on September 1, 1999. She said that about a year later, she saw Mr. McKinney and he told her the following: On the afternoon of September 1, Mr. McKinney and the defendant were smoking marijuana and drinking in Ms. Ellis's and the defendant's apartment. The defendant ran water for a bath, did not realize the water was hot, and put the victim into the bathtub. She said Mr. McKinney told her that the defendant was going to do him a favor in return for his testimony. She said that after she talked to Mr. McKinney, she told a prosecutor what he had said. A jury convicted the defendant of aggravated child abuse.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction. Specifically, he contends that the evidence does not show that he acted knowingly, which is an element of aggravated child abuse. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As charged in the indictment, a person commits aggravated child abuse by committing the offense of child abuse and the "act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). Child abuse is defined as "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). Serious bodily injury is bodily injury involving "(A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." In other words, a person knowingly commits aggravated child abuse when the person knowingly treats a child in an abusive manner.

Viewed in the light most favorable to the state, the evidence supports the jury's finding the defendant guilty of aggravated child abuse. LaSonya Ellis testified that when she left the victim in the defendant's care on the morning of September 1, 1999, the victim was uninjured. About five hours later, the defendant telephoned Ms. Ellis and told her that her oldest son Kyrus had burned the victim. Ms. Ellis returned home to find that the victim had been severely burned on the back of his legs and his buttocks and that he had a black eye and a busted lip. Although the defendant told Ms. Ellis that Kyrus picked up the victim and put him in the bathtub, Ms. Ellis said that the victim weighed more than Kyrus and that she had never seen Kyrus pick up the victim before. In addition, although the defendant told Ms. Ellis that he found the victim sitting in the bathtub and that Kyrus was standing in the tub, Kyrus was not burned by hot water. Photographs that the state introduced into evidence show extensive, and obviously painful, scalding to the victim's legs and right buttock. Other photographs show that the victim's legs have been severely scarred. Dr. Storgion testified that the pattern of the victim's injuries indicated that he had been immersed in hot water for at least a minute, and Dr. Iglesias believed that the victim had been forced to sit in hot water for several seconds. We conclude that a rational jury could have found beyond a reasonable doubt that the defendant knowingly put the victim in hot water and caused the victim to be seriously burned. The evidence is sufficient to support the conviction.

## II. DEFENDANT'S REFUSAL TO GIVE A STATEMENT

Next, the defendant claims that the trial court erred by failing to grant his request for a mistrial when Sergeant Sharonda Hampton testified that the defendant refused to give a statement to the police. He contends that even though the trial court gave the jury a curative instruction, Sergeant Hampton's testimony "likely prejudiced the jury against the defendant to the extent that it had an effect on the verdict which could not have been prevented by the court's instruction." The state claims that Sergeant Hampton's improper testimony was cured by the trial court's instruction. We believe the trial court did not abuse its discretion by refusing to grant the defendant's mistrial request.

During Sergeant Hampton's direct testimony, the following exchange occurred:

Q.      Did you speak with the defendant?

A.      I briefly spoke to him after I spoke to the complainant.

Q.      Was he cooperative with you?

A.      Yes.  He - - yeah.  He answered my questions - - the brief questions I asked him.

Q.      Okay.  Did he provide a statement?

A.      No.

At that point, the defense asked to approach the bench.  During a bench conference, the defense asked the trial court to grant a mistrial because the defendant had been under no obligation to talk to the police.  The defense contended that the jury's hearing that the defendant refused to talk to the police combined with the fact that the defendant would not testify at trial was so prejudicial as to warrant declaring a mistrial.  Moreover, the defense was afraid that a curative instruction would draw the jury's attention to Sergeant Hampton's testimony and asked that the court not give a curative instruction.  The trial court, while agreeing that the state's question and Sergeant Hampton's answer were improper, refused to grant the request for a mistrial and instructed the jury as follows:

> Ladies and gentlemen, the last question and answer that was asked before we took this - - broke for a little bit, you in no way should consider that in any way whatsoever.  So it will be clear, there's no obligation, no duty at all by anyone at that point or any point to make a statement to this officer; and it cannot be considered for any purpose, for any purpose, that a statement at that time was not made. We don't know the facts.  We don't know the circumstances.  And I'm going to instruct you in no way to consider that.  Is that clear?  It was absolutely inappropriate and improper, and I want you in no way to consider that.  Okay.  You may proceed.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996).  Normally, a mistrial should be declared only if there is a manifest necessity for such action.  Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977).   This court will not disturb that decision unless there is an abuse of discretion.  State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Initially, we note that although the defendant claims Sergeant Hampton testified that he "refused" to give a statement, the trial transcript reveals that when the state asked the witness if the defendant gave a statement, Sergeant Hampton simply replied, "No."  We question whether a juror

would make an adverse inference from the exchange. Nevertheless, even if the state's question and Sergeant Hampton's response were improper, we conclude that the defendant has failed to show that the trial court abused its discretion by failing to grant a mistrial. After Sergeant Hampton answered the state's question, the defense immediately asked to approach the bench. Once Sergeant Hampton's direct testimony resumed, the state did not question her further about the defendant's not talking to police. In addition, the trial court provided the jury with a lengthy curative instruction. Under these circumstances, the trial court properly refused to grant a mistrial.

## III. JENCKS MATERIAL

The defendant claims that the trial court erred by not ordering a mistrial when the state failed to produce notes that a prosecutor made during a pretrial conversation with the victim's mother, LaSonya Ellis. He argues that pursuant to Rule 26.2, Tenn. R. Crim. P., the state was required to produce this Jencks material after Ms. Ellis's direct testimony and that the state's failure to do so constitutes reversible error. As an aside to this claim, he asserts that because Ms. Ellis's rebuttal testimony was admissible only to impeach Omar McKinney's testimony, the trial court should have instructed the jury that it could not consider Ms. Ellis's testimony as substantive evidence. The state contends that the notes did not constitute a "statement" under Rule 26.2 and does not address the defendant's second claim. We agree with the state that it was not required to give the prosecutor's notes to the defense and conclude that the trial court did not err by failing to instruct the jury as to Ms. Ellis's testimony.

During Ms. Ellis's rebuttal testimony, she stated that Omar McKinney told her that he and the defendant had been smoking marijuana and drinking before the victim was burned. On cross-examination, the following exchange occurred:

Q.      So Mr. McKinney told you all this when? A year later?

A.      That's correct. That's - -

Q.      A year from September 1, '99 would be sometime in September of 2000; is that correct?

A.      I can't give you a definite date. I know it was a year later.

Q.      Well, from September of 2000 until today, how long is that? October, November, December, January and February. Five months? Did you contact any law enforcement officers or did you contact anybody and tell them that?

A.      I talked to [the prosecutor]. When I found out, I immediately called her when I got to work.

. . . .

Q.      I've been handed a piece of yellow paper with some writing
        on it.  It's not signed.  It's not dated.

 . . . .

Q.      Let me pass this to you and see if you can identify it.  Is this
        your handwriting?

        [The state]: Judge, her testimony was that she called, Judge.

        THE COURT: Approach the bench. . . .  As I recall the
testimony, she said she called and told [the prosecutor].

        [Defense attorney]: I understand.  But we also asked for all
statements after she'd testified, and we weren't given those
statements.

        THE COURT: Unless it's been (indiscernible) by her, it's not
a statement.

        [Defense attorney]: Well - -

        THE COURT: You know, I think it's not appropriate to ask
her about it unless you ask her first if she gave or made a statement.

        [Defense attorney]: I understand.

. . . .

Q.      Ms. Ellis, there appears no date on this statement.  Do you
        have a guess as to when this statement was given to counsel?

A.      No, sir, I don't.

Q.      You do not. . . .  I have nothing further.

The defendant's attorney did not request that the trial court review the yellow paper nor did he move
to admit the paper as part of the record.  During the defendant's motion for new trial hearing, the
state told the trial court that the writings on the yellow paper were notes that a district attorney made
from the attorney's conversation with Ms. Ellis.  In denying the defendant's new trial motion, the

trial court ruled that the notes were not "a statement in fact of what she knew or what she was going to testify to" and that, in any event, the defendant got to review the notes.

Rule 26.2, Tenn. R. Crim. P., provides, in pertinent part, as follows:

> **(a) Motion for Production**. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.
>
> . . . .
>
> **(e) Sanction for Failure to Produce Statement**. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.
>
> . . . .
>
> **(g) Definition**. As used in this rule, a "statement" of a witness means:
>
> (1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness; or
>
> (2) a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof.

"The determination of what constitutes a producible statement is a matter that rests purely within the discretion of the trial judge and can be set aside by the appellate courts only if his decision is clearly erroneous." State v. Daniel, 663 S.W.2d 809, 812 (Tenn. Crim. App. 1983) (considering Rule 16(a)(1)(F), the precursor to the current Rule 26.2).

Initially, we note that the notes are not a part of the record on appeal. Nevertheless, the defendant has presented no proof that the notes are substantially a verbatim recital of Ms. Ellis's oral statement or that the notes were recorded contemporaneously with Ms. Ellis's conversation with the

prosecutor. Thus, we agree with the state that the defendant has failed to show that the attorney's notes constituted a "statement" under Rule 26.2(g)(2). Moreover, we doubt that the prosecutor's notes would fall within the purview of Rule 26.2. "This court has previously determined that notes made by an investigator while interviewing a witness do not qualify under the definition of a 'substantially verbatim recital' of a witness's oral statement under Rule 26.2. We believe that the same holding would apply to notes made by an attorney." State v. Jerry James Hayes, Carroll County, slip op. at 6 (Tenn. Crim. App. Aug. 26, 1999) (citation omitted). Thus, the state's failure to give the notes to the defense after Ms. Ellis's direct testimony was not error, much less reversible error.

We now turn to the defendant's claim that the trial court should have instructed the jury that it could not consider Ms. Ellis's testimony substantively. After Omar McKinney testified for the defense, the state called Ms. Ellis to testify that Mr. McKinney told her that he and the defendant smoked marijuana and drank alcohol before the victim was burned. As the defendant correctly notes in his brief, such testimony was hearsay. See Tenn. R. Evid. 801(c) (providing that hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); Tenn. R. Evid. 802 (stating that hearsay evidence generally is inadmissible). However, our review of the trial transcript reveals that the defendant did not object to Ms. Ellis's testimony. The supreme court has stated that a trial court "generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). Thus, because the defendant did not object to Ms. Ellis's testimony, the jury was entitled to consider it "as if it were, in fact, fully admissible under the law of evidence" and no limiting instruction was necessary. Id. at 280. The defendant is not entitled to relief.

## IV. EXCESSIVE SENTENCE

The defendant contends that his sentence is excessive. Specifically, he claims that the trial court improperly applied enhancement factor (6), that the personal injuries inflicted on the victim were particularly great, because that factor is inherent in the offense. See Tenn. Code Ann. § 40-35-114(6). In addition, he claims that the trial court improperly applied enhancement factor (10), that the defendant "had no hesitation about committing a crime when the risk to human life was high," because the state presented no evidence regarding that factor. See Tenn. Code Ann. § 40-35-114(10). Finally, he contends that the trial court failed to consider his remorse, character, and background as mitigating factors. See Tenn. Code Ann. § 40-35-114(13). The state contends that even if the trial court improperly applied enhancement factors to the defendant's sentence, the sentence is not excessive because the trial court sentenced the defendant only to the presumptive twenty-year sentence. Moreover, the state contends that the trial court was not required to consider the defendant's remorse as a mitigating factor. We conclude that the defendant's sentence is not excessive.

At the sentencing hearing, LaSonya Ellis testified that the defendant should receive the maximum punishment because the victim had been through two or three surgeries and no longer

wanted to take baths.  She said that she had lost custody of her children and that she had to seek counseling.  She said that although she had loved and trusted the defendant, he had hurt her tremendously.  On cross-examination, Ms. Ellis testified that she lost custody of her boys because the Department of Children's Services thought she and the defendant would continue living together if the defendant got out of jail.  She acknowledged that she blamed the defendant for her losing custody of her boys and that she did not know the defendant was facing a twenty-five-year sentence.

Richard Faulkner, the defendant's brother, testified that the defendant had a five-year-old daughter and that he had never seen the defendant mistreat his daughter or any other child.  He said that the defendant babysat Ms. Ellis's boys when Ms. Ellis was working and that he treated the boys as his own children.  He said that it was not in the defendant's nature to abuse a child and that the defendant was hurt to be charged with aggravated child abuse.

John David Washington, the defendant's uncle, testified that he had known the defendant all of the defendant's life.  He said that the defendant was a loving father to the defendant's daughter and that the little girl appeared to love the defendant.  He said that he had no knowledge of the defendant mistreating his daughter and that he did not believe it was in the defendant's nature to mistreat her.

The defendant testified that at the time the victim was injured, he was planning to marry LaSonya Ellis and raise her children as his own.  He acknowledged that he had saved $8,000 for a honeymoon and said he loved Ms. Ellis and her boys.  He said that he wished he had never answered the front door on September 1, 1999, and left the boys unattended.  He said he never thought the boys would climb into the bathtub.

According to the defendant's presentence report, the then twenty-nine-year-old defendant graduated from high school.  The report shows that at the time of his arrest, the defendant had worked at Complex Tooling and Molding for about twenty months and that after his arrest, he worked at Guardian Fiber Glass for a over a year.  The defendant stated that he was in good physical and mental health and that he started using marijuana when he was eighteen years old.  He stated that he had not used marijuana since 1996 and that he had not used alcohol since 1998.  The report shows that the defendant has numerous prior convictions, including theft of property, driving under the influence, driving on a revoked license, and driving on a suspended license.

In sentencing the defendant, the trial court noted that as a Range I, standard offender, the defendant's presumptive sentence for his conviction was twenty years, the midpoint in the range for a Class A felony.  See Tenn. Code Ann. § 40-35-112(a)(1).  The trial court applied the following enhancement factors: (1) the defendant has a previous history of criminal convictions or behavior beyond that necessary to establish his range; (6) the personal injuries inflicted on the victim were particularly great; and (10) the defendant "had no hesitation about committing a crime when the risk to human life was high."  See Tenn. Code Ann. § 40-35-114 (1), (6), (10).  Although the defendant asked the trial court to mitigate his sentence, he did not argue at the sentencing hearing that any

specific mitigating factors applied to his conviction. The trial court did not apply any mitigating factors and sentenced the defendant to twenty years.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the midpoint in the range for a Class A felony unless there are enhancement factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d)-(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

We agree with the defendant that the trial court improperly applied enhancement factor (6) regarding the victim's injuries being particularly great. Tenn. Code Ann. § 40-35-114 specifically prohibits using enhancement factors that are elements of the offense, and our supreme court has held that "proof of serious bodily injury will always constitute proof of particularly great injury." State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994). Thus, because serious bodily injury is an element of aggravated child abuse as charged in the indictment in this case, it was error for the trial court to apply enhancement factor (6) to the defendant's sentence. We also believe that the trial court improperly applied enhancement factor (10) regarding the defendant's having no hesitation about committing a crime when the risk to human life was high. Although the evidence shows that the victim suffered extreme physical pain and burns that resulted in obvious disfigurement, the state presented no proof that the victim's burns were life threatening. See Jones, 883 S.W.2d at 602-03. (providing that enhancement factor (10) is not necessarily inherent in an offense that includes a serious bodily injury element).

Nevertheless, the defendant's sentence is not excessive because the trial court did not increase it above the presumptive sentence of twenty years. Moreover, based upon our de novo review, we believe that under the facts of this case, the trial court could have applied other enhancement factors to the defendant's sentence. For example, the victim, less than two years old on September 1, 1999, was particularly vulnerable because of his age, and the defendant, who had lived with the victim for six months and often acted as the victim's caregiver, abused a position of private trust. See Tenn. Code Ann. § 40-35-114(4), (15). The trial court's improper application of enhancement factors did not result in the defendant receiving an excessive sentence.

As to the defendant's claim that the trial court failed to consider his remorse, character, and background as mitigating factors, we again conclude that the trial court did not err. At the sentencing hearing, the defendant expressed remorse for answering the door on September 1 and leaving the boys alone. However, the defendant maintained that Kyrus put the victim in the bathtub. As to his character and background, the defendant acknowledges abusing illegal drugs in the past, and his presentence report shows that he has committed various offenses. Thus, the trial court did not err by failing to mitigate the defendant's sentence, and the defendant has failed to demonstrate that his sentence is excessive.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-14-